IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEWIS WESLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:11-CV-741-BH |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the *Order Reassigning Case*, dated August 1, 2011, this case has been transferred for all further proceedings and entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed August 26, 2011 (doc. 22), and *Defendant's Motion for Summary Judgment*, filed September 26, 2011. (doc. 23.)  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **DENIED**, Defendant's motion is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

**I.  BACKGROUND**[1]

**A.      Procedural History**

Lewis Wesley (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability benefits under Titles II and XVI of the Social Security Act.  (R. at 27.)  On July 8, 2008, Plaintiff applied for disability insurance

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

- 1 -

benefits and supplemental security income, alleging disability beginning on November 16, 2007, due

to "carpal tunnel syndrome and left shoulder impingement." (R. at 31, 80-83). His applications

were denied initially and upon reconsideration. (R. at 85, 92.) He timely requested a hearing before

an Administrative Law Judge (ALJ). (R. at 98.) He personally appeared and testified at a hearing

held on September 9, 2009 before an ALJ. (R. at 41-79.) On October 2, 2009, the ALJ issued his

decision finding Plaintiff was not disabled. (R. at 31-40.) Plaintiff requested review of the ALJ's

decision, and the Appeals Council denied his request on February 7, 2011, making the ALJ's

decision the final decision of the Commissioner. (R. at 8-11.) He timely appealed the

Commissioner's decision pursuant to 42 U.S.C. § 405(g). (doc. 22.)

## B.    <u>Factual History</u>

### 1.    **Age, Education, and Work Experience**

Plaintiff was born on August 26, 1961. (R. at 80.) At the time of the hearing before the ALJ,

he was 48 years old. (R. at 45.)  He completed the tenth grade, started but did not finish a GED

program, and has past relevant work as a commercial cleaner, machine operator, and commercial

truck driver. (R. at 38, 46.)

### 2.    **Medical Evidence**

On August 18, 2007, Plaintiff injured his hand at work when he lifted a ten-foot pallet

weighing about 65 pounds. (R. at 269.) On August 24, 2007, a physical evaluation of his wrist

revealed "normal alignment of the radiocarpal and ulnocarpal ariticulation," and x-rays indicated

signs of "scapholunate interosseous ligament disruption." (R. at 306.) An MRI taken on September

7, 2007 showed that the "[d]istal radius and ulna and smaller bones of the wrist and proximal

metacarpal bones [were] unremarkable for fracture or contusion or ischemic necrosis" and "no wrist

compartments effusion [was] identifed." (R. at 307.)   The doctor noted a "suspected ganglion cyst that contacts the flexor digitorum profundus tendon." (*Id.*)  Plaintiff's "carpal tunnel [was] usual in contours," the "[f]lexor tendons within [were] unremarkable, and the median nerve [was] not enlarged or inflamed." (*Id.*)  His treating physician issued a "hand surgery referral." (R. at 272.) Plaintiff returned to work after undergoing three weeks of physical therapy, but was limited to light duty work.  (R. at 272, 327.)

On November 16, 2007, Plaintiff was again injured at work when two plastic blocks fell on his head and shoulders.  (R. at 160, 277.)  Because of the injury, he felt pain on the left side of his neck and left shoulder area every time he reached his left arm over his head.  (R. at 277.)  On November 27, 2007, Claudia Ramirez, M.A., L.P.C., evaluated Plaintiff and assessed his "emotional status and physical complaints."  (R. at 297.)  He reported feeling a sharp, aching pain averaging 6 of a 10-point scale, but stated that sometimes it was as high as 8 of 10.  (R. at 298.)  He stated that on a 10-point scale, his pain interfered with his ability to work at a level of 7 out of 10, and it interfered with his "recreational, social, and familial activities" at a level of 5 out of 10.  (*Id.*)  His pain also caused him insomnia, feelings of helplessness, and the inability to socialize.  (*Id.*)  During the evaluation, Dr. Ramirez noted that he was well groomed and oriented; his attention and concentration were normal; his memory was intact; his intellectual functioning was within normal limits; his speech was normal; his motor activity was deemed normal; his affect was broad; his judgment, impulse, and insight were good; his thought process was goal oriented; and he denied having hallucinations, delusions, or suicidal or homicidal ideations.  (R. at 299.)  She diagnosed with "[a]djustment disorder, with mixed anxiety and depressed mood ... [e]ffusion of joint, [m]yalgia and myositis ... secondary to the work injury" and assigned him a Global Assessment of Functioning

- 3 -

(GAF) score of 58.  (*Id.*)  She concluded that he would "greatly benefit from a brief course of individual psychotherapeutic intervention," and recommended that he participate in a low-level therapy program for six weeks.  (R. at 300.)

On January 14, 2008, Plaintiff consulted with Jack M. Thomas, M.D. (R. at 264.)  He reported having problems with his eyes and experiencing pain, numbness, and tingling in both of his shoulders.  (*Id.*)  X-rays revealed a "thickening of the acromion and changes in the acromioclavicular joint, particularly of [his] left shoulder." (R. at 265.)  Dr. Thomas noted that there was "no obvious neurological impingement or structural instability."  (*Id.*) He diagnosed Plaintiff with "impingement syndrome of the left shoulder subacromial area with partial thickness tears of the rotator cuff" and administered him a steroid injection in his left shoulder.  (*Id.*)  During a follow-up consultation on April 9, 2008,  Dr. Thomas noted that Plaintiff was awake, alert, and oriented and that his motor and sensory functions, reflexes, gait, and coordination were "grossly intact."  (R. at 261.)  He opined that Plaintiff would probably need surgery of his left shoulder, but noted that he "wishe[d] to try conservative treatment" instead.  (*Id.*)  He noted that Plaintiff had a "somewhat better range of motion, but still ha[d] weakness in abduction and external rotation", and he injected "Marcaine and Depo-Medrol in the subacromial bursa" to help alleviate his pain.  (*Id.*)

On January 21, 2008, Plaintiff underwent an evaluation at the Texas Hand Center.  (R. at 269.)  Thomas C. DiLiberti, M.D., the consultative physician, diagnosed him with right wrist scapholunate advanced collapse with radial styloid/scaphoid arthritis, mild right carpal tunnel syndrome, and an interior ganglion cyst.  (R. at 270.)  He recommended "splinting as needed,  anti-inflammatory medications ... and the use an occasional steroid injection."  (*Id.*)  He opined that Plaintiff would need surgery of his right hand if his symptoms persisted, and it would consist of

- 4 -

"either a scaphoid excision and four-corner fusion, a proximal row carpet three, or a total wrist fusion." (R. at 271.)

On March 12, 2008, upon a referral by the Texas Workers' Compensation Office, Robert Rodriguez, M.D., evaluated Plaintiff, reviewed his medical history, and issued a consultative disability report. (R. at 324.) Plaintiff complained of feeling pain in his right wrist and forearm when he used them for more than 20 minutes or to lift more than 5 pounds. (R. at 327.) Dr. Rodriguez noted that he was cooperative, oriented, and was able to sit, rise from his chair, get on and off the examination table, and walk on his toes and heels "without difficulty." (R. at 328.) He noted "swelling and edema" in Plaintiff's "right wrist area and from the mid-forearm area down to the right wrist area." (*Id.*) He opined that the range of motion of Plaintiff's spine was "within normal limits," there was "no visible muscle atrophy of [his] arms or hands," he had a 25 to 50 percent "reduction in wrist-ulnar deviation and radial deviation," his "right grip [was] decreased by fifty percent," his "left grip [was] decreased by twenty-five percent," and his left shoulder showed positive signs for "impingement." (*Id.*)

Dr. Rodriguez further opined that Plaintiff had "[s]everely deficient right grip strength deficits when compared to norms," he had "right wrist range of motion deficits," and his shoulder and cervical injuries limited his function and physical performance. (R. at 337.) He concluded that Plaintiff could occasionally lift up to 10 pounds and frequently lift five to ten pounds, and that he could work "a partial day" at the sedentary physical demand level with the following restrictions: no forceful gripping with the right hand, no overhead reaching or lifting, no crawling, no weight bearing on his upper extremities, and no pushing or pulling. (R. at 325.) He opined that as of that date, Plaintiff had achieved his maximum medical improvement and assigned him a 3 percent

"Whole Person Impairment" and a 5 percent "upper extremity impairment." (R. at 324.) He also concluded that "[n]o further treatment or therapy [was] recommended for [Plaintiff's] right wrist at [that] time," and "encouraged [him] to perform a home exercise program to improve his right hand and forearm strength." (R. at 337.)

A Workers' Compensation Work Status Report completed on March 25, 2008 concluded that Plaintiff was allowed to return to work as of March 12, 2008, with the following restrictions: he could not lift or carry objects weighing more than 10 pounds; could not perform any pushing, pulling, grasping, or squeezing with his right hand and right arm; and could not crawl or bear weight on his upper extremities. (R. at 363.)

On May 12, 2008, during a consultative evaluation, Dr. DiLiberti noted that Plaintiff's neck was "supple [and] without obvious masses," his abdomen was "benign," his chest was "clear," and he had a "regular [heart] rate and rhythm." (R. at 273.) With respect to Plaintiff's right wrist, he opined that he had decreased grip strength, tenderness, "restriction of motion in all planes," a 5 degree radial deviation, and a 10 degree ulnar deviation. (*Id.*) He diagnosed Plaintiff with "scapholunate advanced collapse" and determined that surgery would be necessary if his symptoms did not improve. (R. at 274.)

On June 3, 2008, Plaintiff consulted with Bradley J. Eames, D.O., an orthopedic surgeon, because he felt pain in the left side of his neck and upper left shoulder every time he reached his arm over his head. (R. at 277-78.) Dr. Eames noted that Plaintiff had "some paravertebral muscle spasm on the left side from C5 through C7;" had "very little strength" in his left arm and could not hold it up against active resistance; had a "decreased range of motion of his left shoulder," and he could not "abduct [it] past 90 degrees without assistance." (R. at 278.) He opined that movement of

- 6 -

Plaintiff's left shoulder did not cause "particularly severe" pain, and that he "ha[d] no signs or symptoms of radiculopathy." (*Id.*) He diagnosed Plaintiff with internal derangement of the left shoulder with possible rotator cuff tear, cervical strain, and thoracic myofascial pain. (*Id.*) He concluded that Plaintiff was a "good candidate for a chronic pain program" because at that point he had "apparently exhausted all other treatment options." (*Id.*)

On August 21, 2008, James Wright, M.D., a state agency medical consultant, reviewed Plaintiff's medical evidence and issued a physical residual functional capacity assessment. (R. at 364-71.) He opined that Plaintiff was able to occasionally lift and carry 20 pounds; could frequently lift and carry 10 pounds; could stand, walk, and sit for 6 hours of an 8-hour workday; and he had no postural limitations except that he could only occasionally climb ladders, ropes, or scaffolds. (R. at 365-66.) He further opined that Plaintiff was limited to frequent handling and fingering for his right hand and that he did not have any visual, communicative, or environmental limitations. (R. at 367-68.) He determined that Plaintiff's right wrist pain was "intermittent depending on use" and that the treatment for his left shoulder impingement was "conservative" in nature. (R. at 371.)

On September 12, 2008, Plaintiff's treating physician referred him to Advantage Healthcare Systems for a psychological evaluation and a determination of whether he was a candidate for a "Work Hardening" program. (R. at 377.) Marce Hufnagel, M. Ed., the examining clinician, noted that Plaintiff's pain patterns appeared to be "periodic and intermittent." (R. at 378.) Plaintiff rated his pain at 5 in a 10-point scale and stated that he felt it 50 percent of the time. (*Id.*) He reported experiencing insomnia and moderate fatigue 50 percent of the time as a result of his pain. (*Id.*) Dr. Hufnagel noted that his mood was "euthymic," his affect was "normal," he was "alert and oriented," his thought content "included worry," and he "had no suicidal or homicidal ideations" at that time.

(R. at 379.)   Additionally, his "behavior, speech, mood, affect, short term memory, long term memory, and flow of thought were normal." (*Id.*)  She diagnosed him with "[c]hronic pain disorder associated with both psychological features and general medical condition." (*Id.*)  She noted that he had suffered neck and shoulder injuries, and that he had housing, occupational, and economic problems.  (*Id.*)  As for his psychological strengths, she noted that he was motivated, set realistic goals, was punctual, and he "ha[d] learned how to effectively cope with and tolerate pain." (R. at 378-79.)  She recommended that he undergo 10 "Work Hardening" sessions.  (R. at 380.)  Her prognosis for his participation in the program and subsequent return to work was "good." (*Id.*)

On March 30, 2009, Plaintiff visited with Mahe T. Nadeem, M.D., because he felt "achy, sharp pain" and experienced weakness radiating from his right wrist to his right elbow.  (R. at 391.) Dr. Nadeem noted that his pain was "intermittent and increase[d] with grabbing" and rendered him unable to write.  (*Id.*)  She found that x-rays of his right hand showed an "ossicle bone that may have broken off." (R. at 466.)  She diagnosed right scaphoid dislocation, right carpal tunnel syndrome, and moderate to severe causalgia, and prescribed him pain medication.   (R. at 393.)   During a follow-up evaluation four days later, Dr. Nadeem noted that Plaintiff still complained of aching and burning pain as well as tightness and weakness in his right wrist.  (R. at 456.)  She noted that he was "not taking any pain medications." (*Id.*)  Although tests showed that he had deficits in muscle strength, pinch, and grip strength in his right hand, he "was able to complete all parts of the lift test with favoring of the right." (*Id.*)  She noted that he "was alert, pleasant, and cooperative" during the exam, and "gave good effort in all parts of the test." (*Id.*)

On June 25, 2009, David Azouz, M.D. diagnosed Plaintiff with a large growing mass dorsal radial aspect in his right wrist, DeQuervain's syndrome and synovitis in his right wrist, and noted

that he had diminished extension and abduction in his right thumb.  (R. at 388.)  On June 30, 2009,

Dr. Azouz operated on Plaintiff's right wrist, and the surgery consisted of an "excisional biopsy of

a large mass, tenosynovectomy, tenolysis, and synovectomy of the dorsal radial aspects of the right

wrist."  (R. 474.)  During a follow-up consultation on July 2, 2009, Dr. Azouz noted that Plaintiff

reported to be "much better since the surgery."  (*Id.*)  Although there was post operative swelling

in Plaintiff's right wrist and hand, Dr. Azouz opined that "everything [was] healing well" and that

there was "no evidence of infection, drainage, or dehiscence."  (*Id.*)  He opined that Plaintiff was

"progressing satisfactorily," and noted that he would soon start "a home program of range of motion

exercises."  (*Id.*)  Three weeks after his surgery, Plaintiff felt stiffness in his right wrist, but reported

that "the excruciating pain that he used to have [was] no longer present."  (R. at 473.)  Dr. Azouz

noted that Plaintiff's surgical scar had healed well and that he had "full extension abduction of [his]

right thumb."  (*Id.*)  On August 27, 2009, Plaintiff "claim[ed] that he continue[d] to improve," his

"strength, and range of motion [were] all improving," "he [was] delighted with the results of the

surgery," and he "denied [having] any problems."  (R. at 467.)

On August 24, 2009, Sat Kartar S. Khalsa, Ph. D. conducted a psychological evaluation of

Plaintiff.  (R. at 480-88.)  Plaintiff reported that even after his hand surgery, he was still unable to

perform many of the tasks that he used to, such as cooking.  (R. at 480.)  Dr. Khalsa noted that he

exhibited multiple pain behaviors, including having slow movements, being stiff and guarded,

"position[ing] himself carefully when sitting down in his chair," and rising "slowly and stiffly from

his seat."  (R. at 480-81.)  Plaintiff described his pain as "constant with sharp, burning, and aching

sensations with intermittent radiation of pain up to his right shoulder."  (R. at 482.)  He rated his

pain level at 4 on a 10-point scale, and complained that it interfered with his every-day functioning

and ability to sleep.   (*Id.*)   He reported having "frequent episodes of tearfulness, sadness, helplessness, nervousness, frustration, and irritability due to his persistent, debilitating pain and functional limitations." (R. at 484.)  While he had not yet accepted the idea of living the rest of his life with pain, "he believe[d] somewhat in his ability to [move on] despite his pain." (*Id.*)  Test results showed that he fell in the "moderate range" of depressive and anxiety symptoms. (R. at 485.) Noting the "persistent nature" of Plaintiff's symptoms, Dr. Khalsa recommended a "brief course of cognitive behavioral therapy to improve [his] functioning ... and help speed his recovery." (*Id.*)

On December 3, 2009, Plaintiff visited Dr. Nadeem, complaining of "sharp achy pain and tingling in [his] right wrist and burning and radiating pain up the arm." (R. at 394.)  He stated that the pain and tingling in his right wrist were intermittent but the swelling was constant.  (*Id.*)  Dr. Nadeem noted edema in Plaintiff's right wrist and a "healed scar on the radial side." (R. at 395.) She noted that his gait was "normal" and he was able to stand on his toes and heels.  (*Id.*)  She noted that he had "[d]ecreased right grip and pinch strength" in his right wrist and opined that he "suffer[ed] from depression because of stress and pain and financial distress." (R. at 395-96.)  She diagnosed him with "[r]ight scaphoid lunate advanced collapse (SLAC), [r]ight CTS, and "[m]oderate to severe causalgia." (R. at 396.)  She opined that steroid injections eased his pain and noted that his orthopedic surgeon recommended another surgery on his right wrist.  (*Id.*)

On January 26, 2010, Alex Kaliakin, D.C., a chiropractor, opined that x-rays of Plaintiff's shoulder showed "a bursal tissue response to an enlarged tendon" and opined that he had "tendonosis of the right supraspinatus tendon." (R. at 518.)  Sonographic images of Plaintiff's cervical spine taken on February 23, 2010 revealed "residual C4 PLL fibrosis," "[r]esidual C4-7 facetal inflammation," and an "early form of degenerative joint disease." (R. at 512.)  Apart from

these conditions, the images revealed "no ... evidence of periosteal shearing, infections, ruptures, edema, cysts or hypertrophy of the fascia of ligaments," and were generally "unremarkable." (*Id.*)

On January 27, 2010, Dr. Azouz performed a second surgery on Plaintiff's right wrist. (R. at 526-29.) The surgery included the release of his right carpal tunnel syndrome; decompression and internal neurolysis of the median nerve right hand and wrist; synovectomy of his right hand and wrist; decompression of the ulnar nerve on his right wrist; and internal neurolysis of ulnar nerve on his right wrist. (R. at 526.) After the surgery, Dr. Azouz opined that Plaintiff should remain "off of full and regular duties for approximately 6 to 8 weeks," but that he "may be able to return to light duties and limited left-handed duties as early as 4 weeks." (R. at 529.) On March 11, 2010, Plaintiff reported that "the night pain, paresthesia, numbness, dysesthesia, and radiating pains ha[d] been markedly improved." (R. at 530.) Dr. Azouz noted that while Plaintiff had post-operative swelling and stiffness, he had an "excellent range of motion in the right hand and wrist," and he had "regained two point discrimination in the median and ulnar field distribution of the right hand and wrist." (R. at 530.) He advised Plaintiff to continue with his occupational therapy, range of motion exercises, and massages, and scheduled another follow-up examination. (*Id.*)

### 3.    Hearing Testimony

On September 9, 2009, Plaintiff and a vocational expert testified at a hearing before the ALJ. (R. at 43-79.) Plaintiff was represented by an attorney. (R. at 43.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that he divorced in 2002, currently lived with another adult, and did not have any children. (R. at 46-47.) Because his driver's license was expired, he often used public transportation, and his brother had driven him to the hearing that day. (R. at 47.) He last worked

as a machine operator; before that he had worked as a commercial truck driver and as a janitor.  (R. at 49-50.)  He had not worked since November 2007 because of his shoulder injury.  (R. at 48.)  The Texas Workers Compensation Program paid all his medical bills, but he believed that he had reached his maximum coverage.  (*Id.*)  The program also paid him income benefits of $359 per week from the time of his injury until March 2008.  (R. at 49.)

Plaintiff suffered from a left shoulder injury and carpal tunnel syndrome.  (R. at 51.)  He underwent hand surgery in June 2009 and wore a brace on his wrist in case he might "do a lot of twisting with it."  (*Id.*)  He received physical therapy for his right hand and left shoulder at least five times a week.  (R. at 52.)  He received two steroid injections in his left shoulder for his pain the previous year but had not received one recently.  (R. at 53.)  He was unable to work because he could not use his right hand.  (R. at 56.)  Before his job-related accidents, he did not have any problems with his right wrist, neck, or left shoulder.  (R. at 57.)  He experienced  intermittent pain in his left shoulder because of the "partial thickness of [his] rotator cuff," and he treated the pain with medication.  (R. at 58-59.)  He also felt pain in his neck every day that lasted between 30 minutes to an hour, but his medications relieved that pain.  (R. at 59-60.)

Plaintiff sought mental treatment from Dr. Nadeem because he had "[d]epression, "anxiety," and insomnia due to his pain, he felt bad, and sometimes he didn't even want to get out of bed.  (R. at 62.)  He still felt that way "[a]t times."  (*Id.*)  He took medications for his depression and anxiety, and he believed that they helped.  (R. at 64.)  He last saw his psychologist three weeks before the hearing.  (*Id.*)

His daily routine consisted of going to the doctor, doing "a little reading," and walking for about 15 or 20 minutes.  (R. at 65-66.)  Although in the past he could walk for about 45 minutes, by

the time of the hearing, the "pain [in his] neck" rendered him unable to walk for more than 15 or 20 minutes.  (R. at 65.)  He still could bathe himself, but he could not cook or wash dishes because of the pain in his left shoulder and right hand and arm.  (R. at 66-67.)  He did not think he could lift more than 20 pounds.  (R. at 67.)

In response to counsel's questions, Plaintiff testified that he injured his right wrist at work in August 2007 when he lifted a large pallet, and he injured his left shoulder, also while working, in November 2007 when some "stuff fell on [his] neck, shoulders, and head."  (R. at 68-69.)  He believed that the level of pain in his left shoulder did not justify having surgery at that time, but his pain had been sufficient to justify it two months earlier.  (R. at 71.)  Although the pain in his shoulder was constant, it worsened every time he used his left arm.  (R. at 71-72.)  He took Prozac every morning for his depression and Neurontin three times a day for his pain, but they caused him to be drowsy and sleepy.  (R. at 72-73.)

Plaintiff underwent surgery of his right hand on June 30, 2009 to remove a cyst.  (R. at 74.)  Even after his surgery, he still had difficulty using his right hand.  (*Id.*)  Dr. Azouz, his orthopedic surgeon, last examined his wrist two weeks before the hearing and advised him to follow-up on September 17th.  (R. at 75.)

### b. *Vocational Expert testimony*

Jennifer McGinnis, a vocational expert (VE), also testified at the hearing. (R. at 43, 76-78.) She testified that Plaintiff was "a younger individual with a limited education," and his past work history included jobs as a commercial cleaner (heavy, SVP-2), a machine operator (medium, SVP-3), and a truck driver (medium, SVP-4).  (R. at 76.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's vocational profile could perform his past relevant work with the

following limitations: right-hand dominant; could sit for six hours and stand and walk for up to six hours; "in the dominant upper right extremity" could lift and carry 20 pounds occasionally and 10 pounds frequently; could push and pull any of those weights; could frequently handle, finger, feel, and reach; could occasionally crawl, squat, stoop, bend, and climb; could occasionally reach at or above the shoulder in the upper left extremity; could concentrate for extended periods of time; could respond appropriately to routine changes in the work environment; and could perform "simple, repetitive tasks." (R. at 76-77.) The VE testified that the hypothetical person could not perform any of Plaintiff's past relevant work because of the physical exertion limitations. (R. at 77.) She testified that the hypothetical person could perform other work such as a photocopy machine operator (light, SVP-2), with 1,200 jobs in Texas and 17,200 jobs in the national economy; a counter clerk (light, SVP-2), with 1,150 jobs in Texas and 18,500 jobs in the national economy; and a cafeteria attendant (light, SVP-2), with 2,000 jobs in Texas and 25,000 jobs in the national economy. (R. at 78-79.)

## C.   **ALJ's Findings**

The ALJ issued his decision denying benefits on October 2, 2009. (R. at 31-40.) At step one, he found that Plaintiff met the insured status requirements through December 31, 2011, and had not engaged in substantial gainful activity since his alleged onset date of November 16, 2007. (R. at 33.) At step two, he found that Plaintiff had the following severe impairments: right carpal tunnel syndrome; right scaphoid dissociation; disorder of left shoulder, causalgia; and chronic pain disorder, consisting of depression and anxiety. (R. at 33.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that satisfied the criteria of any impairment listed in the social security regulations. (*Id.*)

Next, the ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform light work, "which entail[ed] the ability to maintain employment," at the level of lifting and carrying a maximum of 20 pounds occasionally and 10 pounds frequently; pushing and pulling 20 pounds occasionally and 10 pounds frequently; walking and standing for 6 hours and sitting for 2 hours of an 8-hour workday; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, and reaching overhead with the upper extremity on the left; and frequently handling, fingering, feeling, and reaching.  (R. at 34-35.)  He further determined that Plaintiff "ha[d] a decreased ability to respond appropriately to routine changes in the work environment, but [could] sustain concentration and [could] perform simple repetitive tasks."  (R. at 35.)

At step four, based on the VE's testimony, the ALJ found that Plaintiff could not perform his past relevant work.  (R. at 38.)  At step five, he determined that considering Plaintiff's age, education, work experience, and RFC, Plaintiff had the ability to perform other work existing in significant numbers in the national economy.  (*Id.*)  Accordingly, the ALJ determined that Plaintiff was not disabled, within the meaning of the social security regulations, at any time between his alleged onset date of November 16, 2007, and the date of the ALJ's decision.  (R. at 39.)

## II.    ANALYSIS

### A.    Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Therefore, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step

review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issues for Review**

Plaintiff presents the following issues for review:

(1)     A residual functional capacity (RFC) finding must be supported by substantial evidence.  The ALJ found [Plaintiff] capable of light work with minimal limitations.  Is the ALJ's RFC finding supported by substantial evidence?

(2)     In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.  Did the ALJ's decision adequately consider whether [Plaintiff] can sustain work at a competitive level?

(Pl. Br. at 1.)

**C.     Credibility**

In the his brief, Plaintiff argues that the ALJ's failure to properly assess his credibility contributed to an RFC determination that was "not reflective of his actual limitations."  (Pl. Br. at 15.)[2]

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  The ALJ is in the best position to assess a claimant's credibility because he "enjoys the benefit of perceiving first-hand the claimant at the hearing."  *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994).  In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process.  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).  First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id.*  Next, the ALJ must evaluate the

---

[2] Although briefed as the second part of the RFC issue, this argument is addressed first because it affects the ALJ's assessment of Plaintiff''s physical limitations.

intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements. *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effects. SSR 96-7p, 1996 WL 374186, at *2. Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider. *See* 20 C.F.R. § 404.1529(c) (2011).[3] Nevertheless, the Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and he must articulate his reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco*, 27 F.3d at 163.

Ultimately, the mere existence of pain is not an automatic ground for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citations omitted). Likewise, an individual's statements regarding pain and other symptoms alone are not conclusive evidence of a disability and must be supported by objective medical evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(a).

---

[3]   These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."   20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3.

Here, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with his RFC assessment.  (R. at 36.)  The ALJ gave specific reasons why Plaintiff's allegations were inconsistent and unpersuasive, and why the evidence "failed to reveal the type of significant clinical and laboratory abnormalities one would expect if [Plaintiff] were in fact disabled."  (R. at 37.)  He noted that although Plaintiff complained of having pain and weakness, he had not undergone surgery for either his carpal tunnel syndrome or his shoulder as of the date of the ALJ's decision.  (*Id.*)  He also noted Dr. Eames's opinion that movement of Plaintiff's left shoulder "did not cause severe pain" and that he "had no signs or symptoms of radiculopathy."  (R. at 37, 278.)  He noted Dr. DiLiberti's opinion that Plaintiff's carpal tunnel syndrome was "only mildly symptomatic," that "the interior ganglion cyst was clinically asymptomatic," and that surgery would be required if the conservative treatment did not alleviate Plaintiff's symptoms.  (R. at 36-37, 274.)  He gave little weight to Dr. DiLiberti's opinions about Plaintiff's exertional limitations, explaining that he served as a "consultative examiner" and had "only seen [Plaintiff] for a few minutes."  (R. at 37.)  He also gave less weight to the chiropractor's findings, explaining that the regulations list chiropractors as "other medical source[s]" and not as "acceptable medical source[s]."  (*Id.*)

The ALJ determined that the non-surgical treatment Plaintiff had received was "generally successful in controlling [his] symptoms" and that other forms of treatment would likewise help control his symptoms if he "incorporated [them] as prescribed."  (*Id.*)  He noted Plaintiff's testimony that his medications relieved his pain, anxiety, and depression, that his shoulder pain was "not severe enough to agree to surgery," and that he received physical therapy and wore a brace to protect his wrist. (R. at 37, 51, 59-60.)  Lastly, the ALJ noted that while Plaintiff claimed to have a decreased

- 20 -

ability to stand and walk due to his neck and shoulder injuries, he also stated that he "ha[d] no problems sitting."  (R. at 38.)

The record reflects that the ALJ properly considered the evidence, including Plaintiff's hearing testimony, and provided a reasoned analysis in support of his credibility finding.  Because substantial evidence supports the ALJ's credibility finding, remand is not required on this issue.

## D.    RFC Determination

Plaintiff also argues that remand is required because the ALJ failed to account for "significant exteriional, postural, and manipulative limitations" in making his RFC determination. (*See* Pl. Br. at 11-15.)

Residual functional capacity is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.

- 21 -

The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco*, 27 F.3d at 164.  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Accordingly, a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.  *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility determination regarding Plaintiff's alleged limitations and evaluating all the evidence of record, the ALJ determined that Plaintiff had the RFC to perform light work, "which entail[ed] the ability to maintain employment" at the level of lifting and carrying a maximum of 20 pounds occasionally and 10 pounds frequently; pushing and pulling 20 pounds occasionally and 10 pounds frequently; walking and standing for 6 hours and sitting for 2 hours of an 8-hour workday; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, and reaching overhead with the upper extremity on the left; and frequently handling, fingering, feeling, and reaching.  (R. at 34-35.)  He also found that Plaintiff "ha[d] a decreased ability to respond appropriately to routine changes in the work environment, but [could] sustain concentration and [could] perform simple repetitive tasks."  (R. at 35.)

1.      *Plaintiff's Exertional and Postural Limitations*

Plaintiff argues that the ALJ's determination that he could occasionally climb ramps and stairs, balance stoop, kneel, crouch, crawl, and reach overhead with his left upper extremity is not supported by substantial evidence because the ALJ improperly discounted his "back, shoulder, and neck impairments;" his "rotator cuff syndrome;" and his "cervical disc injury." (R. at 11-13.)  He takes issue with the ALJ's rejection of Dr. Rodriguez's conclusions that he could only work a partial day at the sedentary level with occasional lifting of up to 10 pounds; frequent lifting of 5 to 10 pounds; and no crawling or overhead reaching, lifting, pushing, pulling or weight bearing on his upper extremities.  (Pr. Br. at 12); (R. at 35, 325.)  He likewise disputes the ALJ's rejection of the Workers' Compensation report that reached similar conclusions.  (*See* Pr. Br. at 12); (R. at 36.)

In assessing Plaintiff's RFC, the ALJ adopted Dr. Rodriguez's findings that Plaintiff had reached his "maximum medical improvement" by March 12, 2008, and that as of that date he had a 5 percent upper extremity impairment and a 3 percent whole person impairment.  (R. at 35, 324.) He adopted Dr. Rodriguez's diagnoses of "right carpal tunnel syndrome, right scaphoid dissocation, and moderately severe causalgia intermittent."  (R. at 35, 329.)[4]  In his assessment, Dr. Rodriguez also opined that Plaintiff had no tenderness, muscle spasms, or trigger points on his back or neck regions; he could "abduct his left shoulder to about one hundred degree[s] with a moderate amount of pain," and his "right shoulder range of motion [was] normal" and pain-free.  (R. at 328.)

The ALJ also adopted Dr. Eames's conclusions that Plaintiff's shoulders showed "no obvious neurological impingement or structural instability" and that his cervical spine showed "no signs or

---

[4] On March 30, 2009, Dr. Nadeem, Plaintiff's treating physician, issued an identical diagnosis. (R. at 396*.*) She also noted that he had undergone a total of 26 therapeutic sessions, and that he had been assigned a 3 percent whole person impairment.  (*See* R. at 395.)

symptoms of radiculopathy" and had "a good range of motion on flexion, extension, side-bending, and rotation." (R. at 36, 265, 278.) Because the disability determination falls within the purview of the ALJ, he was not required to accept all of Dr. Rodriguez's conclusions or the Workers' Compensation report. *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). As the fact-finder, the ALJ had the sole responsibility for deciding whether Dr. Rodriguez's opinions or the Workers' Compensation report were supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] ... to resolve."). Accordingly, substantial evidence supports the ALJ's findings of Plaintiff's exertional and postural limitations.

### 2. *Plaintiff's Manipulative Limitations*

Plaintiff next argues that the ALJ failed to consider "his well-documented hand and wrist limitations," in finding that he could frequently handle, finger, feel, and reach. (Pl. Br. at 12.); (R. at 35.) He contends that the ALJ erred in adopting Dr. Wright's assessment because it was issued before he underwent his wrist surgeries and developed even greater manipulative limitations. (Pl. Br. at 13.)

In determining Plaintiff's manipulative limitations, the ALJ adopted Dr. Wright's RFC assessment. (*See* R. at 35, 367.) He also adopted Dr. DiLiberti's opinions that Plaintiff's carpal tunnel syndrome was "only mildly symptomatic" and that the ganglion cyst on his wrist was "most likely incidental in nature," but rejected his opinions about Plaintiff's exertional limitations, finding that they "contrast[ed] sharply with the other evidence of record." (R. at 35, 37, 274.) Notably, despite his conclusions about Plaintiff's exertional limitations, Dr. Rodriguez also concluded that

"[n]o further treatment or therapy" for his right wrist was necessary at the time of his assessment and encouraged him "to perform a home exercise program *to improve his right hand and forearm strength*." (R. at 337.)

The ALJ also considered Plaintiff's 2009 hand surgery to remove a cyst. (*See* R. at 37.) Plaintiff later reported to be "delighted with the results of the surgery" and stated that despite some stiffness in his wrist, "the excruciating pain that used he used to have [was] no longer present." (R. at 473, 467.) On several occasions, he was found to be healing well and progressing satisfactorily. (*See, e.g.*, R. at 473-74.) The evidence relating to Plaintiff's 2009 hand surgery actually supports the ALJ's finding that he could frequently handle, finger, feel, and reach with his right hand. *See Johnson*, 864. F.2d at 343. The ALJ was allowed to give greater weight to Dr. Wright's RFC assessment than to Dr. DiLiberti's opinions because he found it to be better supported by the evidence. *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981); (R. at 37.) Accordingly, substantial evidence supports the ALJ's findings on Plaintiff's manipulative limitations.

Because substantial evidence supports the ALJ's RFC determination, remand is not required on this issue.

### E.    Plaintiff's Ability to Sustain Work at a Competitive Level

Plaintiff contends that the ALJ erred by implicitly finding that he could maintain employment at a competitive level "despite the record being replete with evidence" that his ailment, by its nature, waxed and waned in its manifestation of disabling symptoms. (Pl. Br. at 15-16.) He essentially argues that the evidence in the record shows that the pain, tingling, dizziness, and headaches caused by his cervical disc injury, left rotator cuff syndrome, and right wrist injury limited his ability to maintain employment. (*See id.*)

- 25 -

A finding that a claimant is able to engage in substantial gainful activity requires "more than a mere determination that [he] can find employment and that he can physically perform certain jobs; it also requires a determination that [he] can hold whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *Leidler v. Sullivan,* 885 F.2d 291, 292-93 (5th Cir. 1981). This requirement extends to cases involving mental as well as physical impairments. *Watson v. Barnhart,* 288 F.3d 212, 217-218 (5th Cir. 2002). The requirement is not universal, however, and the ALJ is not required to make an explicit finding that the claimant can maintain employment over a sustained period in every case. *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). An RFC determination itself encompasses that finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms." *Id.* Nonetheless, allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on maintaining employment. *See id.* (holding that the "nature of the ... impairment [must be] such ... that the claimant is unable to remain employed for any significant period of time") (citations omitted). Accordingly, remand for the ALJ's failure to make an explicit finding on maintaining employment is required only if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (per curiam).

Here, the ALJ explained that an individual's RFC is "his ability to do physical and mental work activities on a sustained basis" and cited 20 C.F.R § 404.1545 and SSR 96-8p, both of which make clear that an RFC is the measure of a claimant's capacity to perform work "on a regular and

continuing basis." (R. at 32.)  After reviewing all the evidence, he found that Plaintiff had the RFC

to perform light work, "which entail[ed] the ability to maintain employment," with certain physical

and mental limitations.  (R. at 34-35.)  He next determined that although Plaintiff was "somewhat

limited by [his] alleged impairment," "the impact of the symptoms did not wholly compromise [his]

ability to function independently, appropriately, and effectively on a sustained basis."  (R. at 38.)

At step five of the disability analysis, he concluded that Plaintiff was "capable of making a

successful adjustment to other work that exists in significant numbers in the national economy."  (R.

at 39.)  Given these findings, there is no "indication that the ALJ did not appreciate that an ability

to perform work on a regular and continuing basis is inherent in the definition of RFC."  *See*

*Dunbar*, 330 F.3d at 672.  The ALJ was therefore not required to make a specific finding on

Plaintiff's ability to maintain employment unless there was "evidence that [his] ability to maintain

employment would be compromised despite his ability to perform employment as an initial matter."

*See id.*

In June 2008, Dr. Eames noted that movement of Plaintiff's shoulder did not cause

"particularly severe" pain.  (R. at 278.)  In September 2008, Plaintiff rated his pain at 5 on a 10-point

scale and reported that it was present 50 percent of the time.  (R. at 378.)  It was found that

Plaintiff's pain was "periodic and intermittent," but that he had "learned how to effectively cope

with and tolerate" that pain.  (*Id.*)  Plaintiff's prognosis for participating in a "Work Hardening"

program and returning to work was "good."  (R. at 380.)  In April 2009, while Plaintiff complained

of aching and burning pain as well as tightness and weakness in his right wrist, it was noted that he

was "not taking [his] pain medications."  (R. at 456.)  Although he had deficits in muscle strength,

pinch, and grip strength in his right hand, he "gave good effort" and "was able to complete all parts

of the lift test with favoring of the right." (*Id.*)

In June 2009, Plaintiff underwent surgery in his right wrist, which consisted of an "excisional biopsy of a large mass, tenosynovectomy, tenolysis, and synovectomy of the dorsal radial aspects of the right wrist." (R. 474.)  He later reported to be "much better" and that despite some stiffness in his right wrist, "the excruciating pain that he used to have [was] no longer present." (R. at 473-74.)  In July 2009, he complained of a "mild achy pain  that [came] and [went]" but stated that "rest and medications help[ed] to alleviate his pain [and] discomfort." (R. at 448.)  By August 2009, he rated his pain level at 4 on a 10-point scale and complained that it interfered with his every-day functioning and his ability to sleep. (R. at 482.)  That same month, however, he also reported that he "continue[d] to improve," his "strength, and range of motion [were] all improving," he was "delighted with the results of the surgery," and "denied [having] any problems." (R. at 467.)  While he had not accepted the idea of living the rest of his life with pain, "he believe[d] somewhat in his ability to [move on] despite his pain." (R. at 482.)  At the hearing before the ALJ, Plaintiff testified that his medication relieved his pain. (R. at 59-60.)  He stated that he received two steroid injections for his shoulder pain the previous year, but had not received one recently. (R. at 53.)  He testified that his shoulder pain was not severe enough to consent to surgery, but that it had been that severe two months earlier. (R. at 71.)

Because evidence of good and bad days does not by itself establish an impairment that by its nature requires an explicit finding on maintaining employment, the ALJ was not required to make such a finding in this case.  *See Perez*, 415 F.3d at 465.  Plaintiff failed to establish that his numbness, tingling, dizziness, and headaches were intermittent conditions that rendered him unable to maintain employment.  Although the evidence showed that Plaintiff's pain was intermittent, the

ALJ properly determined that it was relieved by his medication.  Accordingly, the ALJ was not required to make a specific finding on Plaintiff's ability to maintain employment, and remand is not required on this issue.

### III.  CONCLUSION

Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED**, on this 28th day of September, 2012.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE